## O'Neill et al. *v.* Atlas Automobile Finance Corporation, Appellant.

Argued October 4, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*William Potter Davis, Jr.,* for appellant.

*Joseph H. Resnick,* for appellee.

OPINION BY CUNNINGHAM, J., March 18, 1940:

The proceeding below was assumpsit by a firm of certified public accountants against the defendant finance corporation to recover $677.50, alleged to be due for professional services.

Plaintiffs' statement of claim included three sepa-

rate items, each founded upon an alleged oral contract with defendant—$75 for an examination of defendant's transactions and a report thereon for the month of June, 1936; $456.25 for a detailed examination to determine the extent of certain embezzlements by a bookkeeper; and $146.25 for selecting and training a new bookkeeper. These services were alleged to have been rendered during July and August, 1936.

The defendant, in its pleadings, not only denied liability for any of the items set out in plaintiffs' statement, but also set up a counterclaim for damages in the net amount of $927.30 alleged to have been suffered by it by reason of the asserted negligence of plaintiffs in failing to discover that defendant's bookkeeper had been misappropriating various sums of money over a period of three years prior to July, 1936. During the trial, defendant conceded that plaintiffs were entitled to recover the first item of $75. The jury rendered a verdict in favor of plaintiffs in the amount of $487.03; the court below denied defendant's motions for judgment n. o. v., or a new trial, and entered judgment upon the verdict; this appeal by the defendant followed.

The defendant having admitted liability for the first item sued upon, and the second and third items being based upon contested oral contracts, alleged to have been made subsequent to the discovery of the shortage, these issues of fact arose: (a) Did defendant make these contracts, and if so what were their terms? (b) Did plaintiffs perform the work called for by them? (c) Were the charges for the services performed reasonable? Each issue was necessarily one of fact to be determined by the jury.

As to the second item it was not disputed that the examination was carefully and properly made, but it was contended plaintiffs volunteered these services because of their failure to discover the shortages of the bookkeeper while making prior examinations, hereinafter discussed. On behalf of plaintiffs, O'Neill testified

defendant's president employed them to investigate the circumstances and amount of the shortage and agreed to pay for the work, although no specific sum was mentioned.

With respect to the third item, it was denied by defendant that it had ever agreed to pay plaintiffs for any services of that character.

An examination of the record discloses a number of conflicts in the evidence bearing upon these issues, but it also discloses that plaintiffs adduced sufficient competent evidence to take each issue to the jury. They were submitted in a manner concerning which no complaint is made in the assignments. The verdict was evidently a compromise over the inclusion or rejection of certain items claimed by plaintiffs and the reasonableness of some of their charges, but the matters at issue were exclusively for determination by the jury. We find no error upon this record which would justify the granting of a new trial with respect to these items.

We turn, therefore, to the consideration of defendant's counterclaim. It was not contended by defendant that plaintiffs had been guilty of any negligence in the performance of the contracts upon which they sued; the counterclaim was founded upon the charge that plaintiffs had negligently failed, while rendering prior accounting services to defendant, to discover that the totals upon the tapes submitted by the bookkeeper were false.

Except for a period from January to May, 1935, during which another firm of accountants was employed by defendant, plaintiffs rendered accounting services from December of 1929 up to May 31, 1936. About the middle of July, 1936, it was discovered the bookkeeper had been embezzling funds of the defendant and had concealed her thefts in the following manner. Defendant's business involved the keeping of accounts with a large number of lessees of automobiles who had obli-

gated themselves to pay it monthly rentals. The greater part of its "accounts receivable" consisted of such rentals. A card was prepared for each lessee and payments entered thereon as made. The total of these accounts appeared in the general ledger. On the occasion of each of defendant's monthly audits, the bookkeeper ostensibly totaled the accounts receivable from the cards on the adding machine, so that the total might be compared by the plaintiffs with the ledger entry. The bookkeeper's peculations began in 1933 and her method of concealing them was by "plugging the tapes" of the adding machine. When about to run a tape, she first tabulated the amount she was short without making any figures on the tape and then proceeded to run the tape in the usual way. The result was that the totals on the tapes included not only the sum of the figures appearing thereon but also the amounts she had embezzled.

The dispute between plaintiffs and defendant is with regard to the extent of the undertaking on the part of plaintiffs, under the terms of their employment, during the years they had been examining defendant's books and making reports thereon. Plaintiffs' contention is that their contract was for a limited examination, and a financial review of defendant's books, without verification. Defendant's contention is that the terms of plaintiffs' employment contemplated the making of a complete and detailed audit and the furnishing of certified reports which should have uncovered the shortage.

One of the plaintiffs, O'Neill, testified his original employment was under an oral contract (a fact conceded by defendant) and that "the nature of the work was to review [defendant's] transactions, guide the bookkeeper, preparation of Federal and State Tax Returns, advise with the management of the concern in financial affairs," and that it was not agreed or con-

templated that "certified reports" would be issued. In describing the services rendered he said: "Monthly we would visit the office of the Atlas, make a revision of the transactions, not verifying the data considered, we would instruct the bookkeeper in the handling of technical transactions, we would prepare from the trial balance submitted by the bookkeeper a statement of the condition and a profit and loss statement. We would review that statement with the management, upon the submission of the typewritten report."

The letters of transmittal of the reports used this phraseology: "We have prepared *from the records of* Atlas Automobile Finance Corporation and *information* submitted to us balance sheet as of (designated month and year) and a comparative statement of profit and loss based on the month of (name of month) together with relating schedules." (Italics supplied.)

The services shown by the testimony to have been rendered were accurately described by the learned trial judge, BROWN, JR. J., in his opinion supporting the judgment, as having "consisted of making a review of defendant's transactions, guiding the bookkeeper in the handling of technical transactions, preparing a statement of condition and a profit and loss statement from the trial balance submitted by defendant's bookkeeper, preparing Federal and State Tax Returns, and advising defendant in financial matters. The monthly reports submitted to defendant were uncertified and unverified ...... The accountant's practice was to accept the totals set forth in defendant's general ledger, without checking the individual items that made up the totals. It was stated in letters accompanying the accountant's reports that they were 'prepared from the records of Atlas Automobile Finance Corporation and information submitted to us.' "

When plaintiffs were reengaged in July, 1935, the extent of their undertaking was set forth by them in a

letter addressed to the president of the defendant company and accepted by it as satisfactory. The letter read:

"Confirming our recent conversation we agree, with respect to the Atlas Automobile Finance Corp. and the Universal Auto Loan Co., *to make a monthly examination of the transactions and submit monthly reports in substantially the same form as heretofore* and to prepare annually the Federal Income Tax Return, Pennsylvania State Income Tax Return, and the Pennsylvania Capital Stock and Corporate Loans Report. In addition to the above, we will also prepare your personal Federal Income Tax Return and your Pennsylvania State Income Tax Return. This work is to commence with the transactions on June 1, 1935, and continue until May 31, 1936, for the total sum of $1,050, payable in twelve equal monthly amounts as reports are submitted. Please indicate your agreement to this arrangement by signing the duplicate of this letter in the space provided below and return to us." (Italics supplied.)

It was agreed that the share of the total compensation chargeable to the defendant company would be $75 a month. This contract by its terms expired May 31, 1936. The compensation therein provided for was paid up to and including the report for May, 1936. The reference in the letter to the submission of "monthly reports in substantially the same form as heretofore," is not without significance in view of the rejection by the jury of the entire counterclaim. The subsequent verbal contract made in July, 1936, and involving the first item in plaintiffs' claim of $75 for an examination of defendant's transactions and a report thereon for the month of June, 1936, was, as plaintiffs contend, for an examination and report similar to those theretofore rendered. The report was made in the usual form and defendant's concession at the trial of liability for that

item may have been considered by the jury as some confirmation of plaintiffs' contention relative to the extent of their duties.

In support of plaintiffs' version of their responsibilities under the contract, they called, as an expert witness, Henry S. McCaffrey; no objection was made to his competency. His testimony corroborated that of O'Neill with respect to the difference between an ordinary audit and report and a certified one, verified from independent sources. Defendant offered no expert testimony to contradict that introduced by plaintiffs.

It is apparent from what has been said that the services rendered up to May 31, 1936, were rendered under a contract partly oral and partly written. It is well settled that the terms and construction of such a contract are for the jury where, as here, its terms are disputed. *Philadelphia to use v. Stewart*, 201 Pa. 526, 530, 51 A. 348; *Bastian v. Marienville Glass Co.*, 281 Pa. 313, 316, 126 A. 798; and *Dougherty et al. v. Proctor & Schwartz, Inc.*, 317 Pa. 363, 366, 176 A. 439. The jury evidently accepted plaintiffs' version of the terms of their contract and the nature of their duties under it.

The conflicting evidence relative to the counterclaim was necessarily for the jury and the twelfth assignment, based upon the refusal of the trial judge to give binding instructions for the defendant, is without merit. The court below, therefore, did not err in subsequently denying defendant's motion for judgment, n. o. v.

Defendant's other assignments of error are directed to the refusal of a new trial. The first five allege error in the admission of the above mentioned expert testimony and evidence of a similar nature.

We adopt the following excerpts from the opinion of the trial judge as justifying the admission of that evidence:

"The qualifications of these witnesses (O'Neill and McCaffrey) were not challenged. The fact that O'Neill was a party did not, of course, disqualify him as an

expert witness in his own behalf: *Beck v. Phila. Auto. Trade Asso.*, 59 Pa. Superior Ct. 145, 147. Nor was any objection made to the form of the questions put to them. It was contended, however, that in testifying as they did they were interpreting the legal effect of the contract and were thereby usurping the function of the court. With this we were unable to agree ...... The witnesses, moreover, did not testify as to the legal effect of the contract between the parties. They were called to explain the significance of the type of reports which plaintiffs submitted, over an extended period of time, in *performance* of the contract. It has frequently been decided that the construction placed upon a disputed contract by the parties thereto, as shown by their acts or declarations, will ordinarily be adopted, and will certainly be referred to in determining the true nature of the agreement: *Philadelphia, Trustee v. The Lehigh Valley Coal Co.*, 290 Pa. 87, 94; *Armstrong v. Standard Ice Co.*, 129 Pa. Superior Ct. 207, 213. Aside from this, however, in explaining the nature of plaintiffs' performance of their obligations under the contract, the testimony aided the jury in determining whether such performance complied with the terms of the contract. For this purpose it was clearly admissible."

Complaint is made in the eighth, ninth, tenth and eleventh assignments of the disposition made by the trial judge of certain points for charge. The eighth and ninth allege error in affirming plaintiffs' second and third points, reading:

"2. Magee, Liebman & O'Neill, as accountants, are not guarantors or insurers of the correctness of their accounts.

"3. Magee, Liebman & O'Neill as accountants, do not say to the public 'Let us examine your books and vouchers, and we will with absolute certainty discover any dishonesty, every mistake, that exists in those books, and we will protect you against that.' That is not what they undertook to do. They agreed to use

such skill in the performance of their agreement as reasonably prudent, skillful accountants would use under the circumstances."

In our opinion, these points were properly affirmed. The language of the third was taken from *Craig v. Anyon*, 208 N. Y. S. 259, affirmed, 242 N. Y. 569. Reference may also be made to In re *London and General Bank*, 2 Ch. Div. (Eng.) 673 (1895) ; Cooley, Law of Torts (2d ed.) 277.

The tenth and eleventh assignments complain of the refusal of defendant's second and third points:

"2. If you believe from the evidence that the plaintiffs were employed to make a detailed monthly examination and audit of defendant's business transactions and books, and by reason of the plaintiffs' failure so to do a loss or losses resulted, which might otherwise have been prevented, the plaintiffs are liable to the defendant for such losses.

"3. If the work for which the plaintiffs are suing was made necessary because the plaintiffs failed to comply with their contract of employment, then the plaintiffs cannot recover for those services in default of an agreement by defendant to pay."

These points were refused, and we think properly, upon the ground that they were too comprehensive and would require extensive qualification "to present the matters referred to adequately to the jury." It must also be noted that the trial judge affirmed the following points submitted by the defendant:

"1. If you believe from the evidence that the plaintiffs were employed to make a detailed monthly examination and audit of defendant's business transactions and books, then it was the duty of the plaintiffs to ascertain the accuracy of the Accounts Receivable of the defendant and to ascertain whether the books balanced and to make a true and accurate statement of the same to the defendant.

"4. If you find that the plaintiffs broke their contract and if you find that the loss could have been prevented by the plaintiffs' careful and efficient work under their contract, the defendant is entitled to a verdict for the amount of the loss occurring after the date upon which a discovery of embezzlements and thefts should have been made."

The substance of the points refused was covered in those affirmed. Moreover, in the concluding portion of the charge the trial judge, after instructing the jury to determine whether plaintiffs had been "careless, negligent and inefficient," added: "If they were, that is if they were so neglectful in the performance of their work of examination and audit that the embezzlements, which extended over a period of years, were not discovered, and the failure to discover them resulted in this loss which the defendant company sustained, which has been reduced by payments to $927.30, then it seems to me you would be justified in rendering a verdict in the defendant's favor against the plaintiffs for that amount, less of course the $75 which defendant now concedes plaintiffs are entitled to receive."

We have examined the other assignments relative to the admission of testimony objected to by counsel for defendant and are satisfied no reversible error was committed by the trial judge in his rulings upon the admission or rejection of evidence.

We think the counterclaim was submitted to the jury in a manner as favorable to the defendant as it had any right to expect. As the jury rejected the entire counterclaim, nothing further need be said. The assignments of error are severally overruled.

Judgment affirmed.